```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
MARK MADDALONI,

                        Plaintiff,                              MEMORANDUM & ORDER
                                                                19-cv-3146 (RPK) (ST)
        -against-

PENSION TRUST FUND OF THE
PENSION, HOSPITALIZATION AND
BENEFIT PLAN OF THE ELECTRICAL
INDUSTRY; and BOARD OF TRUSTEES
OF THE PENSION TRUST FUND OF
THE PENSION, HOSPITALIZATION
AND BENEFIT PLAN OF THE
ELECTRICAL INDUSTRY,

                        Defendants.
---------------------------------------------------------x
```

RACHEL P. KOVNER, United States District Judge:

Plaintiff Mark Maddaloni brings this action against the Pension Trust Fund of the Pension, Hospitalization and Benefit Plan of the Electrical Industry (the "Plan") and the Board of Trustees of the Plan (the "Board") under the Employment Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"), claiming defendants improperly denied his application for a disability pension. The parties cross-moved for summary judgment. Because defendants' denial of plaintiff's pension application was arbitrary and capricious, defendants' motion is denied, plaintiff's motion is granted, and the case is remanded to the Board for further proceedings.

## BACKGROUND

The following facts are taken from the parties' Rule 56.1 statements and relevant portions of the record and are undisputed unless otherwise noted.

1

I.  **Factual Background**

Mark Maddaloni, a former union electrician, is a participant in the Plan. Pl.'s Rule 56.1 Statement ¶¶ 3–4 (Dkt. #29-1); Defs.' Rule 56.1 Statement ¶ 20 (Dkt. #27-1). The Plan is an employee benefit plan governed by ERISA that provides disability pensions to individuals who work or used to work in the electrical industry under a collective bargaining agreement negotiated by Local Union No. 3 of the International Brotherhood of Electrical Workers. Defs.' Rule 56.1 Statement ¶¶ 1–3. As explained in more detail below, plaintiff applied for disability benefits from the Plan, which rejected his application, reasoning that he had been required to apply within two years of becoming disabled, and that his failure to do so denied the Plan the opportunity to perform a contemporaneous medical exam or obtain other information relevant to his application.

A. **The Plan's Terms**

The governing instrument relevant to plaintiff's claim is the 2002 Plan. *See* Defs.' Rule 56.1 Statement ¶ 2 n.1. Under the 2002 Plan, the Plan's Pension Committee has "sole power and absolute discretion" in "making any determination" under the Plan. Admin. Record ("AR") 39 (Dkt. #40). The Plan also provides that that the Committee's "construction, interpretation and application of the same reasonably arrived at in good faith shall be final and conclusive and binding on both parties." *Ibid*.

Elsewhere, the 2002 Plan "sets forth the eligibility conditions and requirements for the pensions provided by this Plan." AR 20. It states that "[a] Participant may retire on a Disability Pension if he meets the following requirements:

(a) he is determined by the Pension Committee to be permanently incapacitated or disabled to such an extent that he can no longer secure gainful employment in the electrical injury, or any other line of business. The Committee may elect to accept or require a Social Security Disability award as evidence of such disability; and

>   (b) he has at least 10 Pension Credits, and
>
>   (c) he must have been employed by Contributing Employers or have been available for employment for at least ten (10) years immediately prior to the injury."

*Ibid*. As to timing, this section further provides that "[a] Participant who is collecting Workers' Compensation or disability benefits must apply for a Disability Pension no later than 2 years from the date the Participant stopped working due to the Workers' Compensation injury or disability." *Ibid*. The Plan does not contain a comparable provision imposing an application deadline on participants who are *not* collecting workers' compensation or disability benefits.

ERISA requires benefit plans to provide their participants a summary plan description ("SPD"), "written in a manner calculated to be understood by the average plan participant," that summarizes key features of the ERISA plan. 29 U.S.C. §§ 1022(a), 1024(b). The operative SPD here describes a two-year deadline for disability applications as applying to all participants—not only those collecting worker's compensation or disability benefits—by stating that "[a] participant who is not employed by a contributing employer immediately prior to the application of a Disability Pension must make such application within 2 years of being disabled." AR 77. The SPD also includes a disclaimer that "the material contained in this [SPD] is for information purposes. To the extent any of the information contained herein is inconsistent with the plan document, the provisions of the plan document will govern." AR 65.

Since at least December 2003, the Board has relied exclusively on disability determinations by the Social Security Administration ("SSA") and has not otherwise made an independent inquiry into whether an applicant is disabled. Defs.' Resp. to Pl.'s Rule 56.1 Statement ¶¶ 22, 24 (Dkt. #30-2).

3

### B. Plaintiff's Application for Disability Benefits

Plaintiff worked in qualifying employment under the Plan from October 1980 until December 2003, when he was furloughed due to lack of work in the electrical industry. Pl.'s Rule 56.1 Statement ¶ 4. He states that he did not return to work because his "body hurt so bad that [he] could not go back," *id.* ¶ 6, and that he did not apply for workers' compensation or short-term disability benefits, *id.* ¶ 7.

Plaintiff applied for SSA disability benefits on April 21, 2004. *Id.* ¶ 9. The SSA denied his application on April 14, 2005. Defs.' Rule 56.1 Statement ¶ 24. Plaintiff appealed and, on May 17, 2013, the SSA ruled plaintiff had been disabled since December 19, 2003—the last day that he worked a job covered by the Plan. Pl.'s Rule 56.1 Statement ¶ 10. It awarded him benefits retroactive to that date. *Ibid.*

According to plaintiff, immediately after he received this award, he contacted the Plan Office about seeking a disability pension under the Plan, but was told that it was too late for him to apply "because he had not worked for the past 10 years." Compl. ¶¶ 18–19 (Dkt. #1). Plaintiff submitted a formal application for a disability pension with the Plan on December 8, 2017. Pl.'s Rule 56.1 Statement ¶ 10. On December 16, 2017, the Plan's Administrator informed plaintiff that his application was denied because he had failed to apply within two years of becoming disabled. *Id.* ¶ 12.

Plaintiff appealed this denial to the Board arguing, as relevant here, that the two-year time bar only applies to applicants who collect workers' compensation or disability benefits, neither of which he had received. *Id.* ¶ 17.

In 2018, the Board's Pension Subcommittee recommended the denial of plaintiff's appeal. Defs.' Rule 56.1 Statement ¶ 32. The Board then denied plaintiff's appeal. AR 127. The Plan

4

Administrator's letter informing plaintiff of this denial stated, in part, that "the Trustees have uniformly and consistently interpreted Section 3.05 [of the 2002 Plan] to mean that a participant who has ceased working due to a disability must apply for a Disability Pension within two years from the date the participant became disabled. That interpretation is plainly reflected in the 2001 [SPD], which was sent to you." *Id*. at 128.

This denial letter further stated that plaintiff's "failure to submit the application within two years of [plaintiff] allegedly becoming disabled supports the . . . denial of [plaintiff's] appeal for the reason that [plaintiff] deprived [the Board] of the opportunity to determine whether [plaintiff was] actually disabled in 2003." *Ibid*. Accordingly, the Board "based [its] denial of [plaintiff's] appeal also on Section 3.05's requirement that [the Board] are authorized to decide whether the participant is disabled." *Ibid*. The letter asserted that plaintiff "did not submit any medical documentation to substantiate [his] medical condition and qualification for a Disability Pension in 2003 when [he] allegedly [was] injured," *ibid.*, and, since plaintiff did not apply for benefits "within two years of the allegedly disability, the Plan was denied the opportunity to have [plaintiff] examined at that time to determine the extent of [his] disability," *id*. at 129.

The letter also addressed the SSA's 2013 determination that plaintiff had indeed been disabled since December 19, 2003—his last date of employment in the electrical industry. *Ibid*. According to the letter, the SSA's administrative law judge ("ALJ") based that determination on "the residual functional capacity" of a person close to fifty-three years old, "as opposed to a [forty]-year old person at the time of the alleged disability." *Ibid*. The letter stated that the SSA award did "not provide sufficient medical documentation of [plaintiff's] medical condition in 2003," adding that "intervening acts" could have "occurred after [plaintiff] stopped work in December 2003 that rendered [plaintiff] disabled at a later point," or plaintiff's disability could have been

5

"due to the passage of the intervening ten years." *Ibid.* The letter also stated that a disability report prepared at the SSA's request in February 2005 had found that plaintiff was not disabled. *Ibid.*

### C. This Lawsuit

In 2019, plaintiff filed this lawsuit, seeking benefits under 29 U.S.C. § 1132(a)(1)(B). He alleges that the Board's denial of his disability pension application was arbitrary and capricious. *See* Compl. ¶¶ 48–52. Defendants and plaintiff filed cross-motions for summary judgment.*

## STANDARD OF REVIEW

Where, as here, an ERISA plan gives a plan administrator "discretionary authority to determine eligibility for benefits or to construe the terms of the plan," federal courts review a plan administrator's decision to deny benefits to a plan participant under an arbitrary and capricious standard of review. *In re DeRogatis*, 904 F.3d 174, 187 (2d Cir. 2018) (citation omitted).

A court will not overturn a plan administrator's denial of benefits under this standard unless the administrator's decision "is found to be 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Pepe v. Newspaper & Mail Deliveries'-Publishers' Pension Fund*, 559 F.3d 140, 146–47 (2d Cir. 2009) (citing *Pagan v. NYNEX Pension Plan,* 52 F.3d 438, 441–42 (2d Cir. 1995)). However, "where the administrator imposes a standard not required by the plan's provisions, or interprets the plan in a manner inconsistent with its plain words, its actions may well be found to be arbitrary and capricious." *Id.* at 147 (quoting *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 133 (2d Cir. 2008)) (quotation marks omitted); *see Frommert v. Conkright*, 738 F.3d 522, 529–30 (2d Cir. 2013). And while the arbitrary and capricious standard

---

* The complaint also alleged that the Board should be equitably estopped from denying the application under 29 U.S.C. § 1132(a)(3) because of representations that a Plan representative allegedly made to plaintiff regarding the application process. *See* Compl. ¶¶ 53–67. Defendants moved for summary judgment on that claim, and plaintiff did not oppose that portion of the summary judgment motion. Accordingly, I granted defendants' motion for summary judgment with respect to the equitable estoppel claim on August 31, 2021. *See* Minute Entry & Order dated Aug. 31, 2021.

is "highly deferential," *Halberg v. United Behavioral Health*, 408 F. Supp. 3d 118, 141 (E.D.N.Y. 2019) (quoting *Preville v. PepsiCo Hourly Emps. Ret. Plan*, 649 F. App'x 63, 64 (2d Cir. 2016)) (quotation marks omitted), a court must nevertheless make "a searching and careful determination as to whether the conclusion reached by the administrator in view of the facts before it was indeed rational," *Magee v. Metro. Life Ins. Co.*, 632 F. Supp. 2d 308, 317 (S.D.N.Y. 2009) (citation and quotation marks omitted); *see Archer v. Hartford Life & Accident Ins. Co.*, No. 18-CV-1158 (WFK) (VMS), 2021 WL 2109113, at *3 (E.D.N.Y. May 25, 2021) (same); *Jeffrey Farkas, M.D., LLC v. Cigna Health & Life Ins. Co.*, 386 F. Supp. 3d 238, 243 (E.D.N.Y. 2019) (similar).

Federal Rule of Civil Procedure 56(a) governs motions for summary judgment in the context of ERISA benefits denial claims. *See Tyll v. Stanley Black & Decker Life Ins. Program*, 857 F. App'x 674, 676 n.1 (2d Cir. 2021); *Perezaj v. Building Serv. 32B-J Pension Fund*, No. 04-CV-3768 (FB), 2005 WL 1993392, at *3 (E.D.N.Y. Aug. 17, 2005). That rule provides for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It follows that where the arbitrary and capricious standard of review applies, a party must "demonstrate no genuine dispute of material fact as to whether [the] challenged . . . decision was arbitrary and capricious." *Kruk v. Metro. Life. Ins. Co.*, 567 F. App'x 17, 19 (2d Cir. 2014).

## DISCUSSION

The Board acted arbitrarily and capriciously in denying plaintiff's application. The Board could not permissibly deny plaintiff's application based on a supposed two-year application deadline because the 2002 Plan does not impose such a deadline on individuals not receiving worker's compensation or temporary disability benefits. The Board was not free to condition plaintiff's receipt of benefits on a requirement not supported by the Plan's terms. Nor was the

7

Board justified in denying plaintiff's application on the theory that his delay denied the Board the opportunity to obtain timely medical evidence. Plaintiff complied with the application requirements in place when he submitted his application, and the Board—which has adjudicated every other disability application since 2003 based exclusively on social security awards—has given no reasoned explanation for why it was unable to make a disability determination in plaintiff's case based on his complete application.

**I.        Two-Year Time Limit**

The Board acted arbitrarily and capriciously in denying plaintiff's application for benefits as untimely based on a term not set out in the Plan—that plaintiff was required to apply for his disability pension within two years of his becoming to disabled.

The trustees of an ERISA plan may not deny a claim based on a rule that is not fairly contained in the ERISA plan itself. Federal law places the written plan "at the center of ERISA," by providing that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument," 29 U.S.C. § 1102(a)(1), and an administrator must act "in accordance with the documents and instruments governing the plan insofar as they accord with the statute, § 1104(a)(1)(D)," *US Airways Inc. v. McCutchen*, 569 U.S. 88, 101 (2013) (quotation marks omitted). The statutory scheme is thus "built around reliance on the face of written plan documents," *ibid.* (quoting *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995)), which are construed according to "ordinary principles of contract interpretation," *id.* at 102. As a general matter, under ordinary contract principles, a party interpreting a contract may not "add[] terms or provisions" to a contract. 11 *Williston on Contracts* § 31:6 (4th ed.).

Accordingly, "[e]ven when trustees of a pension plan are entitled to deference in interpreting the terms of the plan, deference cannot be so broad as to permit them to graft additional requirements onto unambiguous plan definitions." *Gallo v. Madera*, 136 F.3d 326, 330 (2d Cir.

8

1998); *see Frommert*, 738 F.3d at 529–30 (trustees of a plan cannot "impose a standard not required by the plan's provisions"); *Dabertin v. HCR Manor Care, Inc.*, 373 F.3d 822, 831 (7th Cir. 2004) (concluding that trustees acted arbitrarily and capriciously when they "imposed new requirements on Plan participants that were not part of the language of the Plan" and noting that "[a]n ERISA benefit cannot be a moving target where the plan administrator continues to add conditions precedent to the award of benefits").

That principle renders arbitrary and capricious the Board's denial of plaintiff's application based on the requirement—not contained in the 2002 Plan—that plaintiff apply for his disability pension within two years of becoming disabled. Under the 2002 Plan, a participant "may retire on a Disability Pension" if he meets three requirements—being "permanently incapacitated or disabled," having "at least 10 Pension Credits," and having "been employed by Contributing Employers or hav[ing] been available for employment for at least ten (10) years immediately prior to the injury." AR 20. The 2002 Plan further requires that "[a] Participant *who is collecting Workers' Compensation or disability benefits* must apply for a Disability Pension no later than 2 years from the date the Participant stopped working due to the Workers' Compensation injury or disability." *Ibid.* (emphasis added). But because plaintiff never sought worker's compensation or other disability benefits, this two-year requirement does not apply to him. And no provision of the Plan requires that individuals who are *not* collecting workers' compensation or disability benefits must also apply within two years of becoming disabled. The Board acted arbitrarily and capriciously by denying plaintiff's application based on a requirement that an individual *not* collecting workers' compensation or disability benefits must apply within two years, because it is arbitrary and capricious for trustees to "impose a standard not required by the plan's provisions." *Frommert*, 738 F.3d at 529–30.

9

Defendants' counterargument misunderstands the power of ERISA trustees. In defendants' view, because the plan was "silent" about whether participants who were not receiving Workers' Compensation or disability pay had to apply for benefits within two years, the Board had "broad discretion" to impose such a limit. *See* Defs.' Mem. in Supp. of Summ. J. Mot. ("Defs' Mem.") 13 (Dkt. #27-2). The Board argues it may enforce that limit because doing so is supported by statements in the SPD, their own past practice, and practical reasons such as enhancing the Board' ability to make accurate disability determinations or an interest in treating all plan members alike. *Id.* at 13–16. They rely on the Supreme Court's statement in *McCutchen* that because "[t]he words of a plan may . . . leave gaps[,] . . . a court must often 'look outside the plan's written language' to decide what an agreement means," 569 U.S. at 102; *see* Defs.' Mem. at 13–16. But the "ordinary principles of contract interpretation" that *McCutchen* applies, 569 U.S. at 102, set out *when* courts may "fill gaps" using evidence outside the plan itself. And those principles do not aid defendants.

First, under the principle at issue in *McCutchen*, a contract may be interpreted as incorporating "background legal rules—the doctrines that typically or traditionally have governed a given situation when no agreement states otherwise." *Ibid.* (citing 11 R. Lord, *Williston on Contracts* § 31:7 (4th ed. 2012) and Restatement (Second) of Contracts § 221 (1979) to support this proposition). Thus, in *McCutchen,* when an ERISA plan addressed the distribution of recoveries, but did not define whether the term 'recovery' meant "every dollar received from a third party" or "the true recovery, after the costs of obtaining it are deducted," *id.* at 103, the Supreme Court resolved the ambiguity by applying the "background rule" on that question applied in courts of equity and most states, *id.* at 104–06. This rule of construction does not aid defendants,

10

who have not even argued that there exists a "background legal rule[]," *ibid.,* that implicitly supplies a two-year deadline for plaintiff's disability application.

Second, "ordinary principles of contract interpretation," *McCutchen*, 569 U.S. at 102, permit the use of extrinsic evidence of the parties' intended meaning—like an SPD or evidence of past practice—only under limited circumstances. Such evidence may be used to resolve ambiguities in the language of an ERISA plan. *Aramony v. United Way of America*, 254 F.3d 403, 412–13 (2d Cir. 2001); *see Cannady v. Bd. of Trustees of Boilermaker-Blacksmith Nat'l Pension Tr.*, No. 20-CV-3141 (RDS) (JFB) (SRU), 2022 WL 151298, at *2 (2d Cir. Jan. 18, 2022) (summary order) (same). "Language is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Aramony*, 254 F.3d at 412 (citation and quotation marks omitted). But extrinsic evidence may not be used to construe unambiguous terms or to create ambiguity about what a contract means. *Id.* at 412–13; *see Feifer v. Prudential Ins. Co. of America*, 306 F.3d 1202, 1210 (2d Cir. 2002) ("It is axiomatic that where the language of a contract is unambiguous, the parties' intent is determined within the four corners of the contract, without reference to external evidence"). Thus, the Second Circuit in *Aramony* reversed a decision that used extrinsic evidence to construe an ERISA plan, reasoning that a court must "interpret and enforce 'unambiguous language in an ERISA plan' according to its 'plain meaning,'" and noting that "[i]n making a determination of ambiguity 'reference may not be had to matters external'" to the agreement. 254 F.3d at 412–13 (citation omitted).

These contract principles prohibit defendants from imposing a two-year application deadline on plaintiff based on extrinsic evidence like the SPD and past practice. There is no ambiguous language in the 2002 Plan that could be read to contain such a deadline. The only

11

provision that sets out a two-year application deadline indisputably does not apply, because it states that "Participant[s] who [are] collecting Workers' Compensation or disability benefits" must apply within two years of their disability, *see* AR 20, and plaintiff did not fall in that group of participants, Pl.'s Rule 56.1 Statement ¶ 7. Indeed, defendants effectively concede their use of extrinsic evidence is not justified based on ambiguity in the 2002 Plan because they do not address plaintiff's argument that "this case does not involve an ambiguity in the Plan," instead asserting that "ambiguity in the plan is not the *only* circumstance where trustees may look beyond plan language . . . [and the Plan here] was silent as to the time limit applicable to those rare participants, like [plaintiff], who were not collecting workers compensation or short-term disability benefits," Defs.' Mem. of Law in Opp'n ("Defs.' Opp'n Mem.") 8 (Dkt. #30). But as explained above, *McCutchen* reiterates that ERISA plans are to be construed in accordance with "ordinary principles of contract interpretation." 569 U.S. at 102. And defendants identify no ordinary principle of contract interpretation that aids them here.

In sum, defendants acted arbitrarily and capriciously in denying plaintiff's disability application because the application was not filed within two years of plaintiff's becoming disabled. The 2002 Plan imposes no such deadline on plaintiff. And conditioning disability benefits on "additional, unenumerated requirements" not set out in the 2002 Plan is arbitrary and capricious. *Swaback v. Am. Info. Techs. Corp.*, 103 F.3d 535, 541–42 (7th Cir. 1996); *see Zervos v. Verizon New York, Inc.*, 277 F.3d 635, 647 (2d Cir. 2002); *Frommert*, 738 F.3d at 530.

II.     **Alternative Ground for Benefits Denial**

Defendants cannot sustain their denial of plaintiff's pension application on the alternative ground that plaintiff's delay "denied the [Board] timely medical evidence." Defs.' Mem. 21–23; *see* AR 128–29. In arguing that plaintiff was required to provide that evidence, defendants rely on a declaration from an employee of the Board and an "application form that the [Board] used around

12

the time that [plaintiff] left the electrical industry," Defs.' Opp'n Mem. 17, indicating that had plaintiff sought his pension immediately upon becoming disabled, he would have been required to submit a "doctor's statement" with his application and "would also have been subject to a medical . . . examination," Defs.' Mem. at 21. Plaintiff did not apply for disability benefits until years later, when the application no longer sought such materials, *see* Mot. for Summ. J. Ex. G ("Maddaloni Application") 118 (Dkt. #27-6), and he accordingly did not submit the materials that would have been required in 2003.

The Board's denial on this basis is "without reason." *Hobson v. Metro Life Ins. Co.*, 574 F.3d 75, 83 (2d Cir. 2009) (citation and quotation marks omitted). Plaintiff did not, and was not required to, submit his application for a disability pension in 2003. When plaintiff did apply for disability benefits in 2014, the application form did not require the type of contemporaneous doctor's statement that defendants now complain is missing, instead tying the Plan's disability determination to that of the SSA. Maddaloni Application 116. The change in the Plan's application form reflects the Plan's practice in evaluating applications because, since at least 2003, the Board has not used any information other than social security awards to make disability determinations. *See* Answer (Dkt. #7) ¶¶ 31–32. Defendants cannot rationally complain that plaintiff complied with the application requirements in effect when he applied, rather than the requirements in place when he did not.

Nor have defendants proffered a rational explanation of why plaintiff's compliance with the application requirements in effect in 2014, instead of those in effect in 2003, made it impossible for the Board to determine whether plaintiff was "permanently incapacitated or disabled" at the end of his covered employment, as required to award a disability pension. AR 20 (Plan standard for entitlement to benefits); *see id*. 127–30 (Plan letter suggesting denial was justified based on

13

this standard).  With respect to every other applicant since at least 2003, the Board has made disability determinations based solely on social security awards of the type that exists in plaintiff's case, without considering other evidence.  Compl. ¶¶ 31–32; Answer ¶¶ 31–32.  Defendants do not plausibly explain why they could not do the same here.

At best, they suggest that because a decade passed between the alleged onset of plaintiff's disability and his application, a contemporaneous medical examination would be necessary to rule out other causes of the disability like "intervening acts" or "the passage of" time.  AR 129; *see* Defs.' Mem. 22 (arguing that plaintiff's "case was unique" because of the ten-year gap); Defs.' Opp'n Mem. 17–20 (similar).  But the SSA decision finding that plaintiff was disabled as of the last day that he worked in the electrical industry in 2003 contains a detailed description of medical records contemporaneous with plaintiff's alleged disability.  *See* AR 140–41.  It chronicles plaintiff's August 2002 visit with a rheumatologist and MRI studies from the same month, his October 2002 visit with a psychiatrist, a follow-up visit with the rheumatologist, plaintiff's course of physical therapy from January to August 2003, and a consultative orthopedic examination in January 2005.  *Ibid.*  The Board offers no reason why the passage of time prevents it from making a disability determination using medical information about plaintiff's condition from the time he allegedly became disabled.  Indeed, there is no indication in the Plan's meeting minutes or the Board's decision letters that the Board accounted for the contemporaneous medical information discussed in the SSA decision.  *See* AR 120–30.

In this Court, defendants have not justified the denial of plaintiff's disability application on the alternative ground that the evidence did not support a finding of that plaintiff was disabled.  This decision is sensible.  The Board suggested that alternative rationale in their letter denying plaintiff's appeal when they stated that there was "insufficient medical evidence supporting a

14

finding of disability in 2003." AR 129. But that conclusory statement cannot be characterized as a reasoned determination that is supported by substantial evidence. It takes no account of the SSA decision's substantive and detailed summary of plaintiff's medical condition in 2003, including descriptions of exam findings and imaging studies. *See* AR 140–41. While it may be the case that the Board could rationally conclude that plaintiff's contemporaneous medical records are insufficient to support a disability pension under the Plan despite his SSA award, it is not possible to tell from the Board's letter *why* that might be so. By glossing over the extensive information about plaintiff's condition in the SSA award, the Board failed to support its assertion that the medical evidence was insufficient "with sound reasoning in the record," *Miles v. Principal Life Ins. Co.*, 720 F.3d 472, 489 (2d Cir. 2013), and ignored those parts of the record that did not support its conclusion, *Anderson v. Sotheby's, Inc.*, No. 04-CV-8180 (SAS), 2006 WL 1722576, at *16 (S.D.N.Y. June 22, 2006); *see Latronica v. Local 1430 Int'l Bhd. of Elec. Workers Pension Fund*, 403 F. Supp. 3d 287, 307 (S.D.N.Y. 2019) (finding decision arbitrary and capricious where administrator "cherry-picked evidence without explanation"), *aff'd*, 820 F. App'x 12 (2d Cir. 2020); *Jones v. Life Ins. Co. of N. Am.*, 829 F. Supp. 2d 165, 173 (W.D.N.Y. 2011) (similar); *cf. Neely v. Pension Tr. Fund of the Pension, Hospitalization & Benefit Plan of the Elec. Ind.*, No. 00-CV-2013 (SJ), 2004 WL 2851792, at *11 (E.D.N.Y. Dec. 8, 2004) (finding decision arbitrary and capricious where administrator failed to review the SSA determination).

Indeed, the Board appears to have discounted the SSA award based on a misunderstanding of the SSA decision. The Board reasoned that the ALJ's decision was "based upon the residual functional capacity of a person closely approaching advanced age of 53, as opposed to a 40-year old person at the time of the alleged disability." AR 129. But the Board focuses on the wrong part of the ALJ's decision. While the ALJ noted that plaintiff was a "younger individual . . . on the

15

established disability onset date," AR 142 (quotation marks omitted), and explained that if plaintiff could perform "the full range of sedentary work," SSA rules would require a finding of "not disabled" given plaintiff's age, AR 143, the ALJ did not conclude that plaintiff could perform the full range of sedentary work. Rather, the ALJ found that plaintiff had the residual functional capacity to perform sedentary work with additional limitations on certain activities with his right arm and hand. AR 140. The ALJ posed a hypothetical to a vocational expert based on that residual functional capacity, and the vocational expert testified that no jobs existed in the national economy for a person with plaintiff's characteristics. AR 143. The vocational expert explained "that most non-skilled sedentary work requires the unfettered use of both hands [and] arms, which is not the case [for plaintiff]." *Ibid.* The ALJ "noted" that "*even if* . . . [plaintiff] had the residual functional capacity for a full range of sedentary work, . . . [plaintiff] is 'disabled'" under SSA rules based on his advanced age. *Ibid.* (emphasis added). Yet the ALJ ultimately "rel[ied] upon the expertise of the . . . vocational expert[] [to] find the [plaintiff] 'disabled' as of the alleged onset date of the disability." *Ibid.* The Board may not have been required to explain why they discounted the SSA award, *Richard*, 367 F. App'x at 233, but by offering a rationale that distorted the basis for the SSA award, the Board acted unreasonably, *see Miles*, 720 F.3d at 489 (finding decision arbitrary and capricious where administrator "made assertions that are contradicted by the record" and that "mischaracterized the record"); *cf. Wykstra v. Life Ins. Co. of N. Am.*, 849 F. Supp. 2d 285, 295 (N.D.N.Y. 2012) (misapplication of information contained in doctors' reports was arbitrary and capricious).

The Board's denial of benefits is likewise not justified based on the Board's assertion that that "the only independent disability report"—from a psychiatrist named Dr. Jack Baharlias in 2005—"found that [plaintiff was] not disabled." AR 129. But that report merely concluded that

16

plaintiff's depression would not "prevent [him] from doing normal daily activities," AR 131, a finding which has no relationship to plaintiff's arm impairments, which the ALJ found limited plaintiff's residual functional capacity to a disabling extent.  And the Board makes no effort to address the record regarding plaintiff's arm impairments.

For these reasons, the Board acted arbitrarily and capriciously in denying plaintiff's application for a disability pension.

## CONCLUSION

Plaintiff's motion for summary judgment is granted and defendants' cross-motion is denied.  Where an ERISA benefits denial is arbitrary and capricious, the appropriate remedy is to remand the claim to the administrator for reconsideration unless "there is no possible evidence that could support a denial of benefits." *Miles*, 720 F.3d at 490 (quoting *Miller v. United Welfare Fund*, 72 F.3d 1066, 1074 (2d Cir.1995)) (quotation marks omitted).  Because I cannot conclude that plaintiff is entitled to benefits, the case is remanded to the Board for further proceedings consistent with this Order.

SO ORDERED.

*/s/ Rachel Kovner*
RACHEL P. KOVNER
United States District Judge

Dated: January 3, 2023
       Brooklyn, New York

17